35 F.3d 565
 RICO Bus.Disp.Guide 8657
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Donald G. and Yvonne M. HARNER, Daniel P. Bera, Lavern
Booms, Raymond R. and Barbara J. Shideler, Douglas L. Miles,
Martin Becker, Ben A. and Louise F. Bluestein, William E.
and Diane W. Benton, Winston and Alice L. Bradshaw, Lila P.
Advani and Earl C. and Hazel M. Hart, individually and on
behalf of all others similarly situated, Plaintiffs-Appellants
v.
PRUDENTIAL-BACHE SECURITIES, INC., Prudential-Bache Leasing,
Inc., Bache Group, Inc., Polaris Investment
Management Corporation and Polaris
Aircraft Leasing Corporation,
Defendants-Appellees
 Nos. 92-1353, 92-1910.
 United States Court of Appeals, Sixth Circuit.
 Sept. 8, 1994.
 
 1
 Before: JONES and NORRIS, Circuit Judges; and JARVIS, District Judge.*
 
 
 2
 JARVIS, District Judge.
 
 
 3
 Plaintiffs, individual investors in four limited partnerships, appeal summary judgment for defendants-appellees Prudential-Bache Securities, Inc. ("Prudential"), Prudential-Bache Leasing, Inc. ("Bache"), Bache Group, Inc. ("BGI"), Polaris Investment Management Corporation ("Polaris"), and Polaris Aircraft Leasing Corporation ("PALC") on their securities fraud claims under the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. Secs. 1961-1968 and Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. Sec. 78j(b). Plaintiffs also asserted state law claims for fraud, breach of fiduciary duty, and negligence, which were also dismissed by the district court. For the reasons that follow, we affirm.
 
 I.
 Background
 
 4
 In 1983 and 1984, plaintiffs purchased shares in four related partnerships known as the Prudential-Bache/Polaris Aircraft Investors II--A, B, C and D partnerships (the "Partnerships"). The Partnerships were formed to acquire business and commercial aircraft under short-term leases to third parties, and ultimately to sell the aircraft.
 
 
 5
 At the time of purchase, all of the plaintiffs received a prospectus dated June 15, 1983 ("Prospectus") that detailed the risks and specifics of the investment. Plaintiffs also received a brochure ("Brochure") that cautions the prospective investors to "[t]horoughly review the enclosed Prospectus." Some of the plaintiffs also received a "Fact Sheet" from Prudential, which was labeled "FOR BROKER/DEALER USE ONLY--NOT FOR DISTRIBUTION TO THE PUBLIC." Plaintiffs contend that defendants knew such "internal use only" materials-- i.e., the Fact Sheet--were routinely sent by brokers to customers and prospective investors. Brokers were allegedly told to repeat the material contained in the Fact Sheet. The Fact Sheet contained estimated pro forma returns for the average $10,000 investor, as well as glowing reports as to why the aircraft leasing industry was a good investment, including such statements as "AIRCRAFT RESIDUAL (RESALE) VALUES HAVE CONTINUED TO BE HISTORICALLY HIGH. LET'S EXAMINE WHY...."
 
 
 6
 According to plaintiffs, these and other similar statements were false and misleading. They contend that there was no "excellent market" and resale values were not high, but rather had sharply slumped in the three years prior to the formation of the Partnerships. Plaintiffs contend that the aircraft market was in the worst depression in the market's history.
 
 
 7
 The offering materials received by plaintiffs, however, including the Prospectus and the accompanying Brochure, warned potential investors of the speculative nature of the investment. Among other lengthy, detailed cautionary information, the Prospectus contained the following warnings:
 
 
 8
 THE SECURITIES OFFERED HEREBY ARE SPECULATIVE SECURITIES AND INVOLVE A HIGH DEGREE OF RISK. THE RISKS ASSOCIATED WITH THIS OFFERING ARE REFERRED TO ON THE FOLLOWING PAGE AND ARE DESCRIBED IN THIS PROSPECTUS IN THE SECTION ENTITLED "RISK FACTORS."
 
 
 9
 * * *
 
 
 10
 * * *
 
 
 11
 THIS OFFERING INVOLVES VARIOUS RISKS, INCLUDING RISKS OF AIRCRAFT OWNERSHIP AND LEASING, FEDERAL AIRCRAFT REGULATION RISKS, PARTNERSHIP AND CONTRACTUAL RISKS, AND FEDERAL INCOME TAX RISKS. See "Risk Factors," "Investors Suitability Standards," and "Summary of the Partnership Agreements--Transferability of Units." IN ADDITION, THERE WILL BE TRANSACTIONS BETWEEN THE PARTNERSHIPS AND THE GENERAL PARTNERS AND THEIR AFFILIATES WHICH WILL INVOLVE CONFLICTS OF INTEREST. See "Conflicts of Interest" and "Compensation and Fees of the General Partners and Their Affiliates."
 
 
 12
 The Brochure paints a rosier picture, but it too starts off with a warning:
 
 
 13
 This brochure does not constitute an offer to sell nor a solicitation of an offer to sell any securities. An offer can be made only by the Prospectus for Prudential-Bache Polaris Aircraft Investors II. The use of this brochure is authorized only when preceded or accompanied by the Prospectus. Additionally, none of the aircraft depicted herein are owned by Prudential-Bache Polaris Aircraft Investors II.
 
 
 14
 The Brochure goes on to state that "aircraft have historically retained high resale values while maintaining a fine record of longevity and productivity. The accompanying graphs bear this out." The graphs show "Selected Commercial" and "Selected Business" aircraft, representing three airplanes, maintaining their value over a ten year period. Again, however, this upbeat description is accompanied by a disclaimer: "The used values of the commercial and business aircraft specified in the above graph are not necessarily indicative of the used values of other models of aircraft." The Brochure then goes on to tell investors the investment objectives of the Partnerships, ending with the warning that "there can be no assurance that any of these objectives will be achieved." It then states first among the procedures for investing that one should "[t]horoughly review the enclosed prospectus."
 
 
 15
 In 1985 and 1986, plaintiffs received letters from the Partnerships describing poor market conditions and significantly lower return on the investment than had initially been expected. Nevertheless, brokerage account statements continued to show the "value" of the investment remaining steady at the purchase price. It was not until June 8, 1990, however, that plaintiffs brought suit against the two general partners, Bache and Polaris, as well as Prudential and PALC.
 
 
 16
 Plaintiffs claim to have purchased securities in reliance on Prudential employees' recommendations and representations, as well as on the Prospectus, Brochure, and Fact Sheet. Plaintiffs appeal the dismissal with prejudice of their securities fraud claims under Section 10(b), as being either time-barred or as failing to show justifiable reliance on any material representation. They also appeal from the dismissal of their RICO claims as time-barred and as substantively failing for lack of justifiable reliance. Finally, plaintiffs appeal the dismissal of their pendent state law claims.[1]
 
 II.
 Summary Judgment Standard
 
 17
 This court's review of a grant of summary judgment is de novo. Patton v. Bearden, 8 F.3d 343, 346 (6th Cir.1993). Under Fed.R.Civ.P. 56(c), summary judgment is proper if there is no genuine issue as to any material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). The facts and all reasonable inferences to be drawn therefrom are viewed in a light most favorable to the non-moving party in determining if a genuine issue of material fact exists. Kunz v. United Food & Commercial Workers, Local 876, 5 F.3d 1006, 1008-09 (6th Cir.1993). The standard is " 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.' " Street v. J.C. Bradford & Co., 886 F.2d 1472, 1479 (6th Cir.1989) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986)).
 
 III.
 Statutes of Limitations
 
 18
 Plaintiffs first contend that the district court erred by finding their claims under RICO and Section 10(b) were time-barred. This court held in Herm v. Stafford, 663 F.2d 669 (6th Cir.1981), that "[a] court may properly determine the commencement date for a statute of limitations on summary judgment in the context of a securities case." Id. at 682.[2] (Citations omitted). The court went on to state that "[t]he facts upon which the district court may rely must be sufficient to enable a court to conclude as a matter of law that a reasonably diligent person should have discovered the participation of the particular defendant by the date the fraud should have been discovered." Id.
 
 
 19
 The district court found that the statute of limitations for plaintiffs' RICO actions, which are governed by a four-year federal statute of limitations, accrued as of the date they received the Prospectus or, at the latest, the date they received letters from the Partnerships indicating the poor condition of the aircraft leasing market and the lower-than-expected returns on their investments. Harner v. Prudential Securities, Inc., 785 F.Supp. 626, 635-36 (E.D.Mich.1992). By that time, the court held, they knew or should have known of the possible existence of fraud. Id.
 
 
 20
 Although there is some question as to the applicability of various state statutes to the individual plaintiffs' claims depending on their state of residence, the basic issue is the same in the context of their Section 10(b) claim. Thus, in analyzing whether or not their claims were time-barred, we must first determine the appropriate statute of limitations, and then consider what information would place an investor on inquiry notice of fraudulent activity in order to start the running of the statute of limitations and the point at which plaintiffs were on inquiry notice.[3]
 
 
 21
 Plaintiffs do not dispute defendants' contention that the discovery rule is the appropriate accrual standard to be applied as to their RICO claims.[4] Because this is a pre-Lampf case,[5] however, we must look to state law to determine which statute of limitations should apply to the Section 10(b) claims. In this case, plaintiffs are residents of Michigan, New York and Oklahoma. As to all Section 10(b) claims, the district court applied Michigan's six-year statute of limitations for common law fraud, Mich.Comp.Laws Ann. Sec. 600.5813 and Sec. 600.5827 (West 1987), and its two-year statute of limitations for fraudulent concealment. Mich.Comp.Laws Ann. Sec. 600.5855 (West 1987).[6]
 
 
 22
 Plaintiffs contend that the six-year statute of limitations should be used, and that the statute should begin running from the time the fraud should have been discovered. Defendants, on the other hand, argue that the two-tier statute of limitations should be used. Consequently, they argue that plaintiffs had two years from the time of discovery of the fraud to file suit, and that they had an absolute cut-off of six years from the date of the fraud to file suit.
 
 IV.
 Inquiry Notice
 
 23
 A. Plaintiffs' RICO Claims.
 
 
 24
 The district court considered "whether the 'storm warnings' in this case were sufficient to alert a reasonable investor as to the possibility of fraud...." Harner, 785 F.Supp. at 634. The district court correctly applied the four-year limitations period and the discovery rule to plaintiffs' RICO claims, holding that they received inquiry notice of the alleged fraud in 1983-84, when plaintiffs received the Prospectus, and in 1985-86, when plaintiffs received the reports describing disappointing results due to poor market conditions. Id. at 636.
 
 
 25
 A number of circuits have applied an objective standard as to when a plaintiff should reasonably have discovered fraud in connection with a securities case. This court in Herm employed an objective test, given that we refer in that case to the "reasonably diligent person" standard. Herm, 663 F.2d at 682. Similarly, Gaudin v. KDI Corp., 576 F.2d 708 (6th Cir.1978), discusses treatment of the plaintiff as a person with "ordinary intelligence" when reviewing whether or not he should have discovered the alleged fraud. Id. at 713. The courts have also found that once a plaintiff has acquired facts that should put him on notice of an irregularity or problem with an investment, he is on inquiry notice of the fraud and anything he could have discovered by a diligent search will be imputed to him. See Myers v. Finkle, 950 F.2d 165, 167 (4th Cir.1991); Kennedy v. Josephthal & Co., 814 F.2d 798, 802 (1st Cir.1987); Brown v. E.F. Hutton Group, Inc., 991 F.2d 1020 (2d Cir.1993).
 
 
 26
 Thus, the running of the statute of limitations begins when a plaintiff is put on inquiry notice--that is, when the plaintiff has been presented with evidence suggesting the possibility of fraud. Maggio v. Gerard Freezer & Ice Co., 824 F.2d 123, 128 (1st Cir.1987). "Inquiry notice is triggered by evidence of the possibility of fraud, not full exposition of the scam itself." Kennedy, 814 F.2d at 802. (Citations omitted). As one court has stated:
 
 
 27
 The plaintiff need only possess a low level of awareness; he need not fully learn of the alleged wrongdoing. Knowledge of all facts is not required to set off the prescriptive clock. Thus, the clock begins to tick when a plaintiff senses "storm warnings," not when he hears thunder and sees lightning.
 
 
 28
 Jensen v. Snellings, 636 F.Supp. 1305, 1309 (E.D.La.1986) (emphasis in original; citation omitted); see also Platsis v. E.F. Hutton & Co., 642 F.Supp. 1277, 1291 (W.D.Mich.1986), aff'd, 829 F.2d 13 (6th Cir.1987), cert. denied, 485 U.S. 962 (1988) (plaintiff need not have before him all facts necessary to establish that a statement was untrue or omitted before the limitations period accrues).
 
 
 29
 Defendants contend, and the district court agreed, that plaintiffs were on inquiry notice when they bought their Partnership interests because the Prospectus warned investors of the risks in the depressed aircraft market. The district court found that the Prospectus, the Fact Sheet, and the Brochure, together with any oral representations from Prudential employees, were enough to put plaintiffs on notice of possible problems with the investment. Harner, 785 F.Supp. at 634. The assertions that the aircraft re-leasing market outlook was generally good should have been weighed, according to the district court, against the disclosures in the Prospectus that the market was depressed, and might continue to be so, and that certain commercial airlines were failing. Id. at 635-36. The district court found that this information should have put a reasonable investor on notice of the potential discrepancies between the sales material and the Prospectus. Id.
 
 
 30
 In doing so, the district court explicitly adopted a two-part standard for deciding when a plaintiff should have been aware of the fraud. As to inquiry notice, the court applied an objective test: "Whether the facts were sufficient to raise the possibility of fraud will be determined by an objective standard. The sophisticated stock broker and the uninitiated rube will both be judged by the same standard, i.e., the 'reasonable investor' standard." Id. at 634. As to due diligence, the court applied a subjective test, taking into account the particular plaintiff's ability to exercise diligence in attempting to evaluate the facts discovered. Id.[7]
 
 
 31
 Plaintiffs complain that the Prospectus does not directly refute all of the information contained in the Brochure and Fact Sheet and that they therefore had no notice of the alleged misrepresentations--the exact poor state of the aircraft leasing market in 1983. In analyzing this argument, the district court stated:
 
 
 32
 [T]he applicable standard is the degree of inconsistency that would alert a reasonable investor to the fact that there is a possibility of fraud and the need to exercise due diligence so as to determine whether or not a fraud actually exists. To focus exclusively on the word "directly" is to confuse semantics with substance.
 
 
 33
 Harner, 785 F.Supp. at 637 (discussing Platsis, 642 F.Supp. at 1292).
 
 
 34
 Given the contradictory information contained in the Prospectus, the Brochure, and the Fact Sheet, as a matter of law plaintiffs were on notice of the potential fraud. The Prospectus' details concerning potential risks are not, as plaintiffs contend, mere boilerplate, but rather disclose the poor state of the aircraft leasing market and seriously call into question representations concerning the current and future strength of that market. Even an unsophisticated investor should have been put on notice under such circumstances.[8]
 
 
 35
 The critical risks with which plaintiffs were faced were thus adequately "red-flagged." Here, as in Kennedy, plaintiffs were not free to sit back, ignore the differences, and choose to rely on the optimistic statements in the offering materials while closing their eyes to the possibility of fraud. "[T]here was an abundance of cautionary warnings as to the dicey nature of the aircraft lease market in the Prospectus." Harner, 785 F.Supp. at 639. We hold, therefore, that plaintiffs were on inquiry notice when they received the Prospectus in 1983-84, and having failed to file suit until 1990, their RICO claims are time-barred.
 
 
 36
 The district court also held that plaintiffs had failed to demonstrate a genuine issue of fact with respect to their claim of fraudulent concealment. See Friedman v. Estate of Presser, 929 F.2d 1151, 1159 (6th Cir.1991) ("Plaintiffs have the burden of proving the elements of fraudulent concealment ..."). To prove fraudulent concealment, plaintiffs must establish that: "(1) the defendant concealed the conduct that constitutes the cause of action; (2) defendant's concealment prevented plaintiff from discovering the cause of action within the limitations period; and (3) until discovery, plaintiff exercised due diligence in trying to find out about the cause of action." Pinney Dock & Transport Co. v. Penn Cent. Corp., 838 F.2d 1445, 1465 (6th Cir.), cert. denied, 488 U.S. 880 (1988) (citation omitted). Each element must be pled with particularity. Id.
 
 
 37
 This court has declined to modify this test based upon the differences between active and passive fraudulent concealment. Campbell v. Upjohn Co., 676 F.2d 1122, 1127 (6th Cir.1982). In fact, it is questioned whether concealment can exist at all without some act by the defendant that denies the plaintiff access to the relevant knowledge. Id. Here, it is clear that the state of the airline industry was public knowledge that plaintiffs could have discovered from some of the many newspaper articles they now rely on to claim fraud.
 
 
 38
 Plaintiffs contend that actions of fraudulent concealment tolled the statutes of limitations concerning their RICO and Section 10(b) claims because defendants concealed the existence of the cause of action. They claim in effect that defendants' notices to them in 1985 and 1986 regarding the Partnerships' poor performance and the brokerage houses' failure to re-evaluate the Partnerships' shares on the brokerage statements served to lull them into believing all was well with their investment.
 
 
 39
 However, plaintiffs have made no showing of due diligence in discovering their cause of action, and after opportunity for discovery, pleaded no facts sufficient to warrant an inference of concealment by defendants. Moreover, because plaintiffs were on inquiry notice of the alleged fraud at the time they received the Prospectus, they cannot satisfy the second element of fraudulent concealment--failure to discover the operative facts. See Electric Power Bd. v. Monsanto Co., 879 F.2d 1368, 1377-78 (6th Cir.1989), cert. denied, 493 U.S. 1022 (1990). We hold, therefore, that plaintiffs have failed to plead any facts sufficient to demonstrate fraudulent concealment, much less create a genuine issue of material fact as to that issue.
 
 
 40
 B. Section 10(b).
 
 
 41
 After the Supreme Court's decision in Lampf, the parties stipulated to the dismissal of plaintiffs' Section 10(b) claims as time-barred. Plaintiffs later moved to reinstate these claims pursuant to recently enacted Section 27A. The district court granted the motion as to the Section 10(b) claims of plaintiffs William and Diane Benton, New York residents, who jointly purchased Partnership units within six years of filing the action.[9] The remaining plaintiffs' Section 10(b) claims, however, were not reinstated on the ground that the Michigan six-year statute for fraud ran from the point at which plaintiffs were on inquiry notice after purchasing their shares in the Partnerships in 1983 and 1984. Having been on inquiry notice in 1984 at the latest, plaintiffs should have discovered the alleged fraud by the exercise of due diligence well before 1990. Again, plaintiffs offered no evidence whatsoever demonstrating any due diligence effort to uncover the fraud. Harner, 785 F.Supp. at 636 n. 21. Therefore, because all plaintiffs except for William and Diane Benton purchased their Partnership interests more than six years before bringing this action, their Section 10(b) claims are time-barred.
 
 V.
 Reasonable Reliance
 
 42
 In addition to finding that most of plaintiffs' claims were time-barred, the district court also found that all of plaintiffs' claims were substantively deficient. The elements for a securities fraud case based on misrepresentation are: (1) that the defendants made a misrepresentation of material fact; (2) with scienter; (3) on which plaintiff reasonably relied; (4) which proximately caused plaintiff's injury. See Aschinger v. Columbus Showcase Co., 934 F.2d 1402, 1409 (6th Cir.1991).
 
 
 43
 In Molecular Technology Corp. v. Valentine, 925 F.2d 910 (6th Cir.1991), we adopted a recklessness standard for determining when a plaintiff has justifiably relied on a misrepresentation or omission. Id. at 918. We there adopted an eight-part test to help determine the recklessness of reliance:
 
 
 44
 (1) The sophistication of (sic) expertise of the plaintiff in financial and securities matters;
 
 
 45
 (2) The existence of long-standing business or personal relationships;
 
 
 46
 (3) Access to the relevant information;
 
 
 47
 (4) The existence of a fiduciary relationship;
 
 
 48
 (5) Concealment of the fraud;
 
 
 49
 (6) The opportunity to detect the fraud;
 
 
 50
 (7) Whether the plaintiff initiated the stock transaction or sought to expedite the transaction; and
 
 
 51
 (8) The generality or specificity of the misrepresentations.
 
 
 52
 Id.
 
 
 53
 The district court did not attempt to address all eight factors set forth in this test. Rather, it found the numerous specific warnings about the risk of the investment and the risks attendant to the aircraft leasing market to be so pervasive that to ignore them and to rely only on the more favorable statements in the Brochure and Fact Sheet was unreasonable given "the mix of information available to them." Harner, 785 F.Supp. at 642. The district court stated:
 
 
 54
 In sum, there was no reasonable reliance by the investors on the Defendants' representations sufficient to support a claim of misrepresentation. The Prospectus and other sales materials made clear that the investment was risky and that the aircraft market was unfavorable.
 
 
 55
 * * *
 
 
 56
 * * *
 
 
 57
 [T]he Plaintiffs in the instant case were given abundant warning that their investment was speculative and risky. They knew or should have known that the market was depressed and that competition was keen. To the extent that they relied on prognoses, written or oral, that the market was good and that they were assured a steady stream of income, this reliance was unreasonable in the context of the mix of information available to them.
 
 
 58
 Id. at 641, 642.
 
 
 59
 Stated another way, "if the investor already possesses information sufficient to call the representations into question, he cannot claim later that he relied on or was deceived by the lie." Teamsters Local 282 Pension Trust Fund v. Angelos, 762 F.2d 522, 530 (7th Cir.1985). The Second Circuit has similarly stated that "[w]e are not inclined to impose liability on the basis of statements that clearly 'bespeak caution.' " Luce v. Edelstein, 802 F.2d 49, 56 (2d Cir.1986).
 
 
 60
 The First Circuit in Kennedy v. Josephthal & Co. found reliance to be unjustified as a matter of law on facts similar to those involved in this case and stated: "When [the plaintiffs] closed their eyes and passively accepted the contradictions between [the broker's] statements and the offering memorandum, [the plaintiffs] could not be said to have justifiably relied on the misrepresentations." 814 F.2d at 805.
 
 
 61
 Indeed, courts have routinely held that when materials like a prospectus "bespeak caution," Section 10(b) claims can be rejected. See Sinay v. Lamson & Sessions Co., 948 F.2d 1037, 1040 (6th Cir.1991); Romani v. Shearson Lehman Hutton, 929 F.2d 875, 879 (1st Cir.1991) (summary judgment affirmed; "[A]lthough the offering materials were optimistic ..., [they] unquestionably warned potential investors in a meaningful way that economic conditions in the horsebreeding industry were uncertain."). Here, too, the Prospectus "bespoke caution" by containing both general warnings concerning the risky nature of the investment as well as specific disclosures which "red-flagged" the risks arising from the depressed demand for aircraft and the "dicey nature" of the aircraft leasing market. Harner, 785 F.Supp. at 639. As a matter of law, then, no reasonable investor in plaintiffs' position could have been misled in the face of this cautionary language describing depressed demand for aircraft in the marketplace.
 
 VI.
 State Law Claims
 
 62
 Finally, plaintiffs argue that the district court improperly dismissed their pendent claims, contending that, under the circumstances, they were unfairly deprived of an opportunity to plead additional state law claims. Plaintiffs also claim that the district court did not, as it purported to do, grant summary judgment on their federal claims, but rather dismissed those claims for failure to state a claim upon which relief can be granted because it failed to rely on information outside the pleadings.
 
 
 63
 Plaintiffs' argument that the district court did not properly grant summary judgment is incorrect. The judge clearly received and relied on evidence and information outside the pleadings. Harner, 785 F.Supp. at 629. In addition, because defendants captioned their dispositive motion as one to dismiss or, in the alternative, for summary judgment, plaintiffs cannot claim they were not given sufficient opportunity to present all material made pertinent to defendants' summary judgment motion. Indeed, plaintiffs had no right to assume that the district court would not reach and resolve the pendent claims. While defendants did, in fact, ask the district court to refrain from exercising pendent jurisdiction, they also asked, in the alternative, for dismissal of those claims. Moreover, plaintiffs affirmatively requested the district court to exercise pendent jurisdiction over the state claims. The district court's decision to reach the merits of the pendent claims was not, therefore, unfair.
 
 
 64
 This court has upheld the dismissal, on the merits, of pendent state law claims after the federal claims have been dismissed. Aschinger, 934 F.2d at 1412-13; Province v. Cleveland Press Publishing Co., 787 F.2d 1047, 1055 (6th Cir.1986). Where the dismissal of the federal claims is on the merits, the court has allowed the exercise of pendent jurisdiction to foster judicial economy and avoid multiple litigation over the same issues.
 
 
 65
 Because the genesis of plaintiffs' state law claims all sound in fraud, as do their federal RICO and securities fraud claims, the exercise of pendent jurisdiction here was not an abuse of discretion by the district court. Clearly it would have been necessary to prove many of the same elements in both the state and federal claims. Therefore, judicial economy is served by dismissing them all.
 
 
 66
 In dismissing plaintiffs' pendent claims, the district court stated:
 
 
 67
 The Court has already found that the Plaintiffs have not raised a genuine issue of material fact sufficient to withstand the Defendants' Motion for Summary Judgment on the predicate act of their RICO claim. It similarly finds that the Plaintiffs have failed to make a satisfactory claim under the elements of their common law fraud claim. (Footnote omitted).
 
 
 68
 785 F.Supp. at 643. Accordingly, we hold that judicial economy is served by dismissing all of plaintiffs' state law claims.
 
 VII.
 
 69
 The judgment of the district court is AFFIRMED.
 
 
 
 *
 The Honorable James H. Jarvis, Chief Judge, United States District Court for the Eastern District of Tennessee, sitting by designation
 
 
 [1]
 The procedural history of this case is somewhat complex because the Supreme Court announced a federal statute of limitations for securities frauds during the pendency of this case. See Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson, 501 U.S. 350 (1991). The district court applied the statute of limitations retroactively, as it was required to do by Lampf, and the fraud counts were dismissed. Harner v. Prudential Securities, Inc., 785 F.Supp. 626, 629 (E.D.Mich.1992). Congress then enacted legislation that permits Lampf to be applied only prospectively. The Act was designated as an amendment to Sec. 27A of the Securities Exchange Act. Federal Deposit Insurance Corporation Improvement Act of 1991, Pub.L. 102-242, Sec. 476 (1991). Plaintiffs met the statutory deadlines for filing created by the amendment. In the meantime, the district court had found that plaintiffs knew of the fraud upon receiving the Prospectus and that, therefore, the RICO claims were outside of the four-year statute of limitations and the pendent state law claims all sounded in fraud and therefore failed for lack of reasonable reliance, as would the RICO claims were they not time-barred. Harner, 785 F.Supp. 626. Upon enactment of the amendment to Sec. 27A, the district court reinstated the Section 10(b) claims as to plaintiffs William and Diane Benton, but dismissed them for failure to satisfy the substantive elements of Section 10(b)
 
 
 [2]
 Because this is, essentially, a fraud case, plaintiffs' state of mind is at issue. To prove a Section 10(b) claim based on misrepresentation, plaintiffs must establish ordinary fraud. See Aschinger v. Columbus Showcase Co., 934 F.2d 1402, 1409 (6th Cir.1991). The same is true with respect to plaintiffs' RICO claims, since securities fraud was pleaded as the predicate act. J.A. at 40. In determining when a statute of limitations begins to run in a fraud case, the question becomes when the plaintiff knew or should have known of the fraud. It is now clear that such so-called "state of mind" issues are in the proper case appropriate for summary judgment. Street, 886 F.2d at 1479
 
 
 [3]
 Even as to plaintiffs' Section 10(b) claims, federal law determines the date on which a statute of limitations in a securities case begins to run. Herm, 663 F.2d at 682
 
 
 [4]
 In Agristor Fin. Corp. v. Van Sickle, 967 F.2d 233, 241 (6th Cir.1992), however, we applied the accrual rule set forth in Bivens Gardens Office Bldg., Inc. v. Barnett Bank of Fla, Inc., 906 F.2d 1546, 1554-55 (11th Cir.1990), cert. denied, 500 U.S. 910 (1991). The Bivens rule differs from the discovery rule in that the former "requires that a plaintiff discover, or be in a position to discover, the existence of a pattern of racketeering activity in addition to the existence and source of the injury." Caproni v. Prudential Securities, Inc., 15 F.3d 614, 619-20 (6th Cir.1994). As discussed below, the distinction is of no significance here since defendants' alleged misrepresentations were made in at least three documents delivered to plaintiffs, who thus "should have known that they were part of a pattern of misrepresentation." Id. at 620
 
 
 [5]
 See supra note 2
 
 
 [6]
 With respect to the New York and Oklahoma plaintiffs, the district court used Michigan's borrowing statute. Mich.Comp.Laws Ann. Sec. 600.5861 (West 1987). This statute requires Michigan courts to apply the shorter of either the limitations periods of plaintiffs' state of residence or Michigan. New York has the same limitations period for common law fraud as Michigan. N.Y. (CPLR Law Sec. 213(8)) (McKinney). Oklahoma's fraud statute of limitations requires that all actions be filed within two years from the date of discovery of the fraud. OKLA Stat.Ann. title 12, Sec. 95 (West)
 
 
 [7]
 Defendants contend that plaintiffs did not do anything to attempt to discover the fraud. Plaintiffs do not contest this. In fact, plaintiffs offered no evidence of "any effort whatsoever to investigate" the alleged fraud. Id. at 636 n. 21. Accordingly, we focus solely on the objective standard for inquiry notice
 
 
 [8]
 Plaintiffs' reliance on Mosesian v. Pete Marwick, Mitchell & Co., 727 F.2d 873, 878 (9th Cir.), cert. denied, 469 U.S. 932 (1984), is misplaced. Plaintiffs contend that this case and a series of other Ninth Circuit cases stand for the proposition that the decline in their investment, without more, does not constitute inquiry notice of the original fraud. But here there was more. As explained above, the tension between the market condition disclosed in the Prospectus and the market condition as represented in the Fact Sheet and the Brochure reveal sufficient contradictions to have put plaintiffs on inquiry notice
 
 
 [9]
 The court then dismissed their claim for lack of reasonable reliance